KAREN P. HEWITT
United States Attorney
CHRISTINA M. McCALL
Assistant United States Attorney
California Bar Number 234139
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-6760
Facsimile: (619) 235-2757
christina.mccall@usdoj.gov

Attorneys for Plaintiff
United States of America

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PEDRO DE LA ROSA-SOTO,<br><br>Defendant. | Criminal Case No. 08CR2031-H<br><br>**UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO:**<br><br>**(1) COMPEL DISCOVERY AND PRESERVE EVIDENCE;**<br>**(2) SUPPRESS ANY STATEMENTS**<br>**(3) DISMISS INDICTMENT FOR FAILURE TO ALLEGE ESSENTIAL ELEMENTS**<br>**(4) DISMISS INDICTMENT FOR ALLEGED MISINSTRUCTION OF GRAND JURY**<br>**(5) GRANT LEAVE TO FILE FURTHER MOTIONS**<br><br>**ALONG WITH UNITED STATES' MOTION FOR RECIPROCAL DISCOVERY AND MOTION TO COMPEL FINGERPRINT EXEMPLARS.**<br><br>Date: August 11, 2008<br>Time: 2:00 p.m.<br>Honorable: Marilyn L. Huff |

Plaintiff, United States of America, by and through its counsel, Karen P. Hewitt, United States Attorney, and Christina M. McCall, Assistant United States Attorney, hereby files its Response and Opposition to Defendant's Motions and its Motion for Reciprocal Discovery. This Response and Opposition is based upon the files and records of the case together with the attached statement of facts and memorandum of points and authorities.

# I

# STATEMENT OF FACTS

## A. Defendant's Criminal and Immigration Record

Defendant, Pedro De La Rosa-Soto, is a 43-year-old citizen of Mexico. Defendant never had any legal permission to enter or remain in the United States. Defendant has a lengthy and relatively serious criminal record. In 1990, Defendant was convicted of misdemeanor theft of personal property. In 1993, Defendant was convicted of petty theft with a prior conviction. Also in 1993, Defendant was convicted of burglary and sentenced to 365 days in jail, suspended, and 60 months probation. In 1997, Defendant sustained a felony conviction for petty theft with a prior conviction and was sentenced to 32 months in state prison, following a violation of parole. In 2004, Defendant was convicted of misdemeanor driving under the influence of alcohol and driving without a license and sentenced to three years of probation. The next year, Defendant was convicted of cruelty to a child, in violation of 273A(a) of California's penal code. At the same time, Defendant was convicted of driving while his license was suspended and driving under the influence of alcohol. For these offenses, Defendant was sentenced to 5 years probation, 59 days in jail, and 365 days in jail, suspended.

In federal court, Defendant was convicted in 2000 for a misdemeanor and a felony violation of 8 U.S.C. § 1325 and received a sentence of 24 months in federal prison.

Not surprisingly, Defendant has a disturbing number of arrests at or near the border. Using a variety of aliases as well as his true name, Defendant has been arrested nine times by Border Patrol agents, dating back at least to 1996.

On October 31, 1996, Immigration Judge James ordered Defendant removed to Mexico. Defendant was physically removed from the United States on November 20, 1996. On August 24, 1998, the Immigration and Naturalization Service reinstated Judge James' prior deportation order. On March 24, 1999, the INS again reinstated the deportation order. Defendant was again physically removed on April 12, 1999. On April 24, 2000, the INS once again reinstated the deportation order and removed Defendant through Otay Mesa on that date. Not deterred, Defendant again quickly and illegally re-entered this country, and his deportation order was reinstated on May 10, 2000. Defendant was removed

through San Ysidro on January 26, 2002. On March 28, 2005, Immigration Judge DePaolo ordered Defendant removed to Mexico. That same day, Defendant was removed through San Ysidro.

**B. Defendant's Apprehension**

On April 13, 2008, Border Patrol Agent Thomas Watson was working line watch duties near Tecate. At about 10 p.m., a seismic sensor activated about three-quarters of a mile north of the border. Agent Watson responded to the area of the sensor activation and noticed fresh footprints of a large group of people. Agent Watson took his canine dog and began following the footprints towards Highway 94. After following the footprints for 45 minutes, Agent Beckhelm advised Agent Watson that he was using a night vision scope and that he had located eleven subjects near Agent Watson. Agent Beckhelm directed Agent Watson to an area about 100 yards east of a radio tower. When Agent Watson arrived, he found eleven people trying to conceal themselves in the brush near some burned-out trees. Agent Watson identified himself and called for backup agents to assist him, for safety reasons, since he was alone. Agent Watson told the eleven people: "show me your hands and don't move" while the group waited for five to ten minutes for backup agents to arrive. Once the other agents arrived, Agent Watson questioned the eleven people about their citizenship and nationality. All eleven answered that they were Mexican citizens who had no right to enter or remain in the United States. Agent Watson placed all eleven aliens under arrest; they were transported to the Tecate processing center.

The Tecate processing center is an antiquated mobile trailer facility with extremely limited computer terminals (two or three) that are used to submit fingerprints of arrestees to a national database for comparison. On April 13, the swing shift had 39 arrests that were processed at Tecate, and the midnight shift had 45 apprehensions. The early morning shift of April 14, 2008 resulted in 34 apprehensions to process. Due to a the processing of such a large number of other apprehensions, confirming Defendant's identity, criminal record, and immigration history took much longer than usual. Eventually, agents determined that Defendant was a previously-deported felon who had re-entered the United States without permission, and placed him under arrest for violating 8 U.S.C. § 1326.

At approximately 11:39 a.m., Agent Mata advised Defendant, in Spanish, of his Miranda rights. Defendant indicated that he understood his rights, and agreed to speak with agents without a lawyer present. Defendant was also provided the opportunity to call the Mexican consulate, an opportunity

which he declined. Defendant admitted that he is a citizen of Mexico without any lawful permission to enter the United States. Defendant also said that he knew he crossed into the United States illegally and that he was headed to San Diego to meet with his family and remain in this country.

On June 18, 2008, a federal grand jury for the Southern District of California returned a one-count Indictment against Defendant, charging him with being an alien who was found in the United States without the consent of the Attorney General or the Secretary of Homeland Security, after having been previously excluded, deported, or removed, in violation of Title 8 U.S.C. § 1326. The Indictment further alleged that Defendant was removed from the United States subsequent to July 27, 2001.

## II

## UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS

### A. ORDER COMPELLING DISCOVERY IS UNNECESSARY

No Order is Required; The United States is Complying With Discovery Obligations

The United States has produced 212 pages of discovery as of the filing of this response, as well as a digital video recording of Defendant's post-arrest Miranda warnings. Defense counsel has also received copies of the non-privileged documents inside Defendant's alien file. The United States has complied and will continue to comply with its discovery obligations under Brady v. Maryland, 373 U.S. 83 (1963), the Jenks Act (18 U.S.C. §3500), and Federal Rule of Criminal Procedure 16. Because the United States has complied and will comply with its discovery obligations, an order to compel discovery is unwarranted and the request for such an order should be denied.

1. Defendant's Statements

The United States has already provided defense counsel with an incident report detailing his brief field statements, as well as a DVD recording of his post-arrest interview.

2. Arrest Reports, Notes and Dispatch Tapes

The United States has provided Defendant with all known reports related to Defendant's arrest in this case. The United States is not aware of the existence of any dispatch tapes relevant to this case, but will provide a copy of all existing deportation tapes, which have been requested. The United States will continue to comply with its obligation to provide to Defendant all reports subject to Rule 16.

The Government has no objection to the preservation of the handwritten notes taken by any of the Government's agents that are available at this time. See United States v. Harris, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must preserve their original notes of interviews of an accused or prospective government witnesses). However, the Government objects to providing Defendant with a copy of any available rough notes at this time. Rule 16(a)(1)(A) does not require disclosure of the rough notes where the content of those notes have been accurately reflected in a type-written report. See United States v. Brown, 303 F.3d 582, 590 (5th Cir. 2002); United States v. Coe, 220 F.3d 573, 583 (7th Cir. 2000) (Rule 16(a)(1)(A) does not require disclosure of an agent's notes even where there are "minor discrepancies" between the notes and a report). The Government is not required to produce rough notes pursuant to the Jencks Act, because the notes do not constitute "statements" (as defined 18 U.S.C. § 3500(e)) unless the notes (1) comprise both a substantially verbatim narrative of a witness' assertion, and (2) have been approved or adopted by the witness. United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980). The rough notes in this case probably do not constitute "statements" in accordance with the Jencks Act. See United States v. Ramirez, 954 F.2d 1035, 1038-39 (5th Cir. 1992) (rough notes were not statements under the Jencks Act where notes were scattered and all the information contained in the notes was available in other forms). The notes are not Brady material because the notes do not present any material exculpatory information, or any evidence favorable to Defendant that is material to guilt or punishment. Brown, 303 F.3d at 595-96 (rough notes were not Brady material because the notes were neither favorable to the defense nor material to defendant's guilt or punishment); United States v. Ramos, 27 F.3d 65, 71 (3d Cir. 1994) (mere speculation that agents' rough notes contained Brady evidence was insufficient). If, during a future evidentiary hearing, certain rough notes become discoverable under Rule 16, the Jencks Act, or Brady, the notes in question will be provided to Defendant.

3. Brady Material

The United States will comply with its obligations to disclose exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963). Under Brady and United States v. Agurs, 427 U.S. 97 (1976), the government need not disclose "every bit of information that might affect the jury's decision." United States v. Gardner, 611 F.2d 770, 774-75 (9th Cir. 1980). The standard for disclosure is materiality. Id. "Evidence is material under Brady only if there is a reasonable probability that the result of the

proceeding would have been different had it been disclosed to the defense." United States v. Antonakeas, 255 F.3d 714, 725 (9th Cir. 2001). Impeachment evidence may constitute Brady material "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." United States v. Blanco, 392 F.3d 382, 387 (9th Cir. 2004) (internal quotation marks omitted).

4. Information that May Result in a Lower Sentence

The Government is unaware of any mitigating information in this case, and recognizes that Defendant's lengthy history of criminal and immigration violations is aggravating information.

5. Defendant's Prior Record

The United States has provided Defendant with a copy of all documents relating to Defendant's prior criminal record within the Government's possession, custody, or control and, consequently, has fulfilled its duty of discovery under Rule 16(a)(1)(D). See United States v. Audelo-Sanchez, 923 F.2d 129 (9th Cir. 1990). To the extent that the United States determines that there are any additional documents reflecting Defendant's prior criminal record within its possession, the United States will provide those to Defendant.

6. 404(b) and 609 Evidence

______The United States will disclose in advance of trial the general nature of any "other bad acts" evidence that it intends to introduce at trial pursuant to Federal Rule of Evidence 404(b), and any prior convictions it intends to use as impeachment pursuant to Rule 609. The discovery materials include numerous charging and conviction documents from Defendant's state court criminal cases, as well as his recent federal conviction.

7. Evidence Seized

______The United States has complied and will continue to comply with Fed. R. Crim. P. 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all evidence seized that is within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or is intended for use by the United States as evidence during its case-in-chief at trial, or was obtained from or belongs to Defendant.

The United States need not, however, produce rebuttal evidence in advance of trial. United States v. Givens, 767 F.2d 574, 583-84 (9th Cir. 1984).

8. Preservation of Evidence

______The United States will preserve all evidence to which the defendant is entitled to pursuant to the relevant discovery rules. The United States objects to a blanket request to preserve all physical evidence.

9. Henthorn Material

In advance of trial, the Government will arrange for agencies to conduct a review of the witnesses' personnel files, to determine if there is any information that could be used for impeachment of the witness.

10. Tangible Objects

The United States has complied and will continue to comply with Fed. R. Crim. P. 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy tangible objects that are within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or is intended for use by the United States as evidence during its case-in-chief at trial, or was obtained from or belongs to Defendant.

11. Expert Witnesses

The United States will comply with Fed. R. Crim. P. 16(a)(1)(G) and provide Defendant with notice and a written summary of any expert testimony that the United States intends to use during its case-in-chief at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence.

12. Impeachment Evidence

______The United States acknowledges its obligation to provide impeachment information about its witnesses that meets the relevant standard of materiality, i.e., "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." Blanco, 392 F.3d at 387. The United States has or will comply with its obligation.

13. Evidence of Criminal Investigation of Government Witness

______The United States recognizes and will comply with its obligations under the case law and discovery rules to disclose exculpatory information and impeachment information. To the extent such disclosures are not required by the case law and rules, the United States opposes Defendant's broad request for evidence of any disciplinary investigations into prospective witnesses by federal, state or local authorities, regardless of the outcome of the investigations. Moreover, as discussed above, the

United States has no obligation to disclose information not within its possession. See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985); United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991) (California state prisoner's files outside of federal prosecutor's possession); United States v. Chavez-Vernaza, 844 F.2d 1368, 1375 (9th Cir. 1987) (the federal government had no duty to obtain from state officials documents of which it was aware but over which it had no actual control); cf. Beavers v. U.S., 351 F.2d 507 (9th Cir. 1965) (Jencks Act refers to "any statement" of a witness produced by United States which is in possession of United States and does not apply to a recording in possession of state authorities).

14. Evidence of Bias or Motive to Lie

Defendant requests evidence showing bias motive to falsify or distort testimony. The United States recognizes its obligation to provide information related to the prejudice, bias or other motive to slant testimony of trial witnesses, as mandated in Napue v. Illinois, 360 U.S. 264 (1959). At this time, the United States is unaware of any prospective witness who is biased or prejudiced against Defendant or who has a motive to falsify or distort his or her testimony.

15. Evidence Affecting Perception and Memory

The United States is unaware of any evidence that any government witness's physical ability to perceive, recollect or communicate or commitment to tell the truth is impaired. The United States opposes the request for information that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic. This request is overly broad and ignores the standard of materiality set forth in Brady for exculpatory or impeachment information.

16. Witness Addresses

The United States will provide the names of the witnesses it intends to call at trial. Similarly, the government trusts that Defendant will provide the names of the witnesses he intends to call. Defendant has already received access to the names of potential witnesses through the discovery sent to his counsel. The United States objects to Defendant's request for witness addresses. None of the cases cited by Defendant, nor any rule of discovery, requires the United States to disclose witness addresses. The United States does not know of any individuals who were witnesses to Defendant's offenses except the law enforcement agents who apprehended him. The names of these individuals have

already been provided to Defendant.

17. Witnesses Favorable to Defendant

The Government is not aware of any witnesses who would present testimony favorable to Defendant. As indicated above, the United States will comply with its discovery obligations to produce information that is exculpatory to Defendant. To the extent that it discovers such information, the United States will provide information about witnesses who made favorable statements about Defendant.

18. Statements Relevant to the Defense

Again, the Government is well aware of its duty to turn over any potentially exculpatory information.

19. Jencks Act Material

The United States has or will comply with the disclosure requirements of the Jencks Act. For purposes of the Jencks Act, a "statement" is (1) a written statement made by the witness and signed or otherwise adopted or approved by him, (2) a substantially verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement by the witness before a grand jury. 18 U.S.C. § 3500(e). Notes of an interview only constitute statements discoverable under the Jencks Act if the statements are adopted by the witness, as when the notes are read back to a witness to see whether or not the government agent correctly understood what the witness was saying. United States v. Boshell, 952 F.2d 1101, 1105 (9th Cir. 1991) (citing Goldberg v. United States, 425 U.S. 94, 98 (1976)). By the same token, rough notes by an agent "are not producible under the Jencks Act due to the incomplete nature of the notes." United States v. Cedano-Arellano, 332 F.3d 568, 571 (9th Cir. 2004).

The United States is not aware of any dispatch tapes containing Jencks Act material in this case.

20. Giglio Information

The United States will comply with the requirements of Giglio v. United States, 405 U.S. 150 (1972).

21. Agreements Between the Government and Witnesses

Again, the United States has complied and will continue to comply with its discovery obligations under Brady v. Maryland, 373 U.S. 83 (1963), the Jenks Act (18 U.S.C. §3500), and Federal Rule of Criminal Procedure 16. There are no agreements between the Government and any witness.

22-23. Informants and Cooperating Witnesses

At this time, the United States is not aware of any confidential informants or cooperating witnesses involved in this case. The government must generally disclose the identity of informants where (1) the informant is a material witness, or (2) the informant's testimony is crucial to the defense. Roviaro v. United States, 353 U.S. 53, 59 (1957). These threshold requirements have been interpreted to require that, if any cooperating witnesses or informants were involved or become involved, Defendant must show that disclosure of the informer's identity would be "relevant and helpful" or that the informer was the sole percipient witness before he would even be entitled to an in-camera evidentiary hearing regarding disclosure of the informer's identity. United States v. Jaramillo-Suarez, 950 F.2d 1378, 1386-87 (9th Cir. 1991), quoting Roviaro v. United States, 353 U.S. 53, 60 (1957). Any bias issues will be handled pursuant to Brady.

24. TRAINING OF OFFICERS

Defendant requests copies of written policies and training manuals issued by the Department of Homeland Security regarding the questioning of suspects and issuance of Miranda rights. The United States opposes this motion. Defendant cites no authority in support of this request. Defendant does not explain how Brady, Rule 16, or any other rule of disclosure require the United States to produce the requested information.

25. Residual Request

As stated above, the United States will comply with its discovery obligations in a timely manner.

**C. DEFENDANT'S STATEMENTS ARE ADMISSIBLE**

Defendant moves this Court for an order suppressing his pre-Miranda statements because they were allegedly made while in custody. Alternatively, Defendant seeks a voluntariness hearing under 18 U.S.C. § 3501. Defendant also seeks to suppress his post-arrest statements as involuntary, due to the delay in beginning his interview. As discussed below, Defendant's motions should be denied.

**1. Defendant's Motion Should be Denied Without a Hearing**

Contrary to Defendant's request, the Court should deny the motion to suppress without a hearing. Under Ninth Circuit precedent and Southern District Local Criminal Rule 47.1(g)(1), a defendant is entitled to an evidentiary hearing on a motion to suppress only when the defendant puts forth, in a

declaration, sufficient facts to require a factual finding. United States v. Batiste, 868 F.2d 1089, 1098 (9th Cir. 1989) ("defendant, in his motion to suppress, failed to dispute any material fact in the government's proffer, . . . the district court was not required to hold an evidentiary hearing."). "A hearing will not be held on a defendant's pretrial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue exists such that a hearing is required.'" United States v. Howell, 231 F.3d 615, 621(9th Cir. 2000) (citations omitted).

Here, Defendant has failed to place any issue at factual dispute through a declaration, in clear opposition to Local Rule 47.1(g). Defendant also fails to provide any factual support that a violation of Miranda occurred. This Court should deny Defendant's motion to suppress the statements he made to officials on the day of his arrest.

**1. The Court Should Deny Defendant's Motion To Suppress Pre-Arrest Statements Because The Defendant Was Not In Custody And, Therefore, Miranda Was Inapplicable**

Defendant's Miranda challenge to his pre-arrest statements should be denied because they were not made while in custody. Miranda warnings must be administered only when two factors are present: (1) the suspect is in custody; and (2) the suspect is subjected to police interrogation. Miranda v. Arizona, 384 U.S. 436, 477-78 (1966). The Miranda Court cautioned that its rule was "not intended to hamper the traditional function of police officers in investigating crime." Id. (citation omitted). "A defendant is in custody when, based upon a review of all the pertinent facts, 'a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.'" United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985). To determine whether a suspect is in custody, courts must examine the objective circumstances of the situation, not the subjective views of the interrogator or the person being questioned. Stansbury v. California, 511 U.S. 318, 323 (1994) (per curiam).

The Supreme Court has held that in the "general interest of effective crime prevention and detection . . . a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v.Ohio, 392 U.S. 1, 22 (1968). This authorized investigatory detention or stop which falls short of custody was extended to vehicles in United States v. Brignoni-Ponce, 422 U.S. 873

(1975), where the Supreme Court stated that "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." Id. at 881. The Supreme Court further stated that the "officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." Id. at 881-82. Individuals "temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984).

Thus, it is well settled that the safeguards required by Miranda v. Arizona become applicable when a suspect's freedom of action is curtailed to the degree associated with formal arrest. It is equally well established that Border Patrol agents may, in appropriate circumstances, make a brief investigatory stop and ask questions about citizenship and immigration status. Brignoni-Ponce, 422 U.S. at 878-89. Persons subjected to brief investigatory detentions are not entitled to Miranda warnings. See, e.g., United States v. Woods, 720 F.2d 1022, 1029 (9th Cir. 1983). The fact that an individual may be the "focus" of a criminal investigation when questioned by the police does not compel the provision of Miranda warnings in an otherwise non-custodial setting. Beckwith v. United States, 425 U.S. 341, 347 (1976).

In United States v. Booth, 669 F.2d 1231, 1234 (9th Cir. 1981), the Ninth Circuit stated that whether a person is in custody is answered by reviewing the totality of the facts involved at the time of the alleged restraint. Areas of inquiry include the language used by the officer to summon the individual, the extent to which he is confronted with evidence of his guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual. Based upon a review of all the pertinent facts, the trial court must determine whether a reasonable "innocent" person in like circumstances would conclude that after brief questioning, he would not be free to leave. Id. at 1236. In this regard, "even though one's freedom of action may be inhibited to some degree during an investigatory detention, Miranda warnings need not be given prior to questioning since the restraint is not custodial." Id. at 1237.

Defendant argues that the totality of the circumstances demonstrate that he was in custody and,

therefore, entitled to Miranda warnings. He was briefly detained for an immigration field interview, so Miranda warnings were not necessary.

a. Language Used During The Initial Encounter

There was nothing inherently custodial about Agent Watson's initial encounter with the Defendant. Border Patrol agents regularly ask immigration questions when they encounter groups of individuals walking or driving in remote locations near the border between the United States and Mexico. Moreover, reasonable, law-abiding individuals who are traveling extremely close to the border by hiking late at night would expect that Border Patrol agents responsible for enforcing immigration laws might question them about their immigration status. Agent Watson and his service canine approached a group of suspected illegal aliens after following their footprints for 45 minutes.

Upon arrival, Agent Watson identified himself as a Border Patrol agent and instructed the group to show their hands and not to move. After backup agents arrived, Agent Watson asked all eleven people about their citizenship and whether or not they had documents allowing them to legally enter this country. Such routine immigration questioning is not inherently custodial. Defendant had no reason to believe that he was under arrest or would not be free to leave after he sufficiently answered the questions. Thus, this factor weighs against a finding of custody.

b. Extent to Which The Defendant Was Presented With Evidence Of Guilt

Defendant was not presented with any evidence of guilt prior to his arrest, except for his suspicious actions in hiking near the border with a large group near midnight. Agent Watson certainly had no reason to know of Defendant's lengthy criminal and immigration history upon encountering him on the dark hillside. Thus, this factor also weighs against a finding of custody.

c. Physical Surroundings of the Interrogation

Lastly, there was nothing intimidating or coercive about the surroundings where Defendant was questioned. Defendant is the one who chose to walk with a group of illegal aliens into the Tecate mountains and who chose to hide in the brush to attempt to escape detection by the Border Patrol. Furthermore, a coercive environment was not created simply because one Border Patrol agent approached him for questioning. A reasonable, law-abiding individual hiking in the mountains very close to the border would not be alarmed to be approached by one Border Patrol agents, wearing a

uniform and carrying a weapon while conducting routine duties. So, the fact that one agent tracked a group and approached the members, who were already crouched down in the brush, to question them about their citizenship is insufficient to turn the physical surroundings into a coercive or intimidating environment. Therefore, because the Defendant was not led to a far off or physically intimidating location or subjected to coercive contact, this factor, like the others discussed, weigh against a finding of custody.

d. Duration of the Detention

The initial encounter was a brief couple of questions to ascertain the immigration status of the group. If the group had presented valid documents allowing them to enter the United States, the detention would have been extremely limited. Given that none of the group's members had any right to enter the United States, the immigration field interview necessarily turned into an arrest, because the agents were confronted with evidence of illegal activity. At the time that Defendant made his statements in the field regarding his citizenship, the detention had lasted approximately five to ten minutes, the amount of time required for backup agents to arrive on the scene.

Because Defendant was briefly detained during a routine field interview determine his immigration status, he was not in custody. Therefore, his answers to quick, routine immigration inquiries should not be suppressed.

**2. The Court Should Deny Defendant's Motion To Suppress Post-Arrest Statements Because Miranda Warnings Were Properly Administered And Waived, and the Statements Were Voluntary**

A statement made in response to custodial interrogation is admissible under Miranda v. Arizona, 384 U.S. 437 (1966) and 18 U.S.C. § 3501, if a preponderance of the evidence indicates that the statement was made after an advisement of rights, and was not elicited by improper coercion. See Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of evidence standard governs voluntariness and Miranda determinations; valid waiver of Miranda rights should be found in the "absence of police overreaching"). Although the totality of circumstances, including characteristics of the defendant and details of the interview, should be considered, improper coercive activity must occur for suppression of any statement. See id. (noting that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"); cf. Schneckloth v. Bustamonte, 412 U.S. 218, 226

(1973) ("Some of the factors taken into account have included the youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.") (citations omitted).

a. The Miranda Warnings Were Properly Administered And Waived

In this case, a female agent read Defendant the Miranda rights in Spanish off of a pre-printed form used by the Department of Homeland Security. The pre-printed form correctly states the prophylactic warnings that Mirand v. Arizona and its progeny require. Defendant acknowledged his rights, and said that he was willing to answer Agent Mata's questions without an attorney present. During the interview, Defendant gave responsive answers to the questions, and indicated that he was not under the influence of any mind-altering substances. Following the brief interview, which focused on immigration status and alienage, Defendant signed the form that summarized his answers to the questions, indicating that the answers were true and correct.

b. The Statement was Voluntary

Defendant was 43 years old at the time of his arrest in this case, not a youthful naivete. Defendant had an extensive criminal past in the United States, at both the state and the federal level, leading him to be familiar with our system of justice. There is no evidence of any lack of education or low intelligence for this particular defendant. Defendant was properly advised of his constitutional rights by the interviewing agent. The questioning lasted only twelve minutes, including all of the warnings, and focused almost exclusively on the elements of the 1326 charge. The questioning was not repeated or prolonged. During the interview, no physical punishment was used. One agent was dressed in a regular Border Patrol uniform, and one was dressed in plain clothes. Neither agent displayed any weapons. Defendant was not handcuffed or otherwise physically restrained during the interview.

Defendant seems to have established a rapport with the female agent who questioned him, even helping her pronounce certain Spanish words and smiling while doing so. Prior to questioning, or to the Miranda warnings, Defendant was clearly informed that he was facing criminal charges, and that his administrative rights no longer applied. Defendant raised his hand and swore to tell the truth during the interview. Defendant was dressed in his own clothes

Even though the interview did not begin until about 12 hours after Defendant and his group were apprehended, all of the other circumstances indicate that it was voluntary. Just because the statement was taken outside the "safe harbor" of six hours does not render it involuntary.

c. There was no San Juan Cruz Violation

Defendant baldly asserts on page 9 of his motion, lines 17-19, that the agents did not inform him that his administrative rights no longer applied since he was being charged with a criminal offense. A review of the videotape of the post-arrest Spanish interview shows that the agents explained that the administrative rights were no longer applicable, before issuing the Miranda criminal warnings. There is no evidence of a San Juan Cruz violation.

d. There Was No Two-Step Interrogation

Again, Defendant wrongly asserts on page 9 of his motion that "the Miranda warnings ... were withheld until after Mr. De La Rosa-Soto had already been questioned and confessed" [lines 23-24] and "According to discovery, a second statement was taken from Mr. De La Rosa-Soto after advising him of his rights under Miranda." [lines 15-16.] A review of the discovery materials contradicts this assertion. There is no evidence of an custodial interview prior to the videotaped one conducted by Agent Mata at 11:35 a.m. on April 14, 2008. This assertion is baseless.

**D. THE GRAND JURY WAS NOT MIS-INSTRUCTED**

The Government incorporates by reference the Government's response and opposition regarding this exact issue in United States v. Martinez-Covarrubias, 07CR0491-BTM. This motion has been denied by each court that has considered it. Also incorporated by reference is this Court's order denying the motion to dismiss in case 07CR0491-BTM.

**III**

**UNITED STATES' MOTION FOR RECIPROCAL DISCOVERY**

Defendant has invoked Fed. R. Crim. P. 16(a) and the United States has voluntarily complied with the requirements of Rule 16(a). Therefore, provision 16(b) of that rule, requiring reciprocal discovery, is applicable. The United States hereby requests Defendant to permit the United States to inspect, copy, and photograph any and all books, papers, documents, photographs, tangible objects, or make copies of portions thereof, which are within the possession, custody or control of Defendant and

which he intends to introduce as evidence in his case-in-chief at trial.

The United States further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession or control of Defendant, which he intends to introduce as evidence-in-chief at the trial or which were prepared by a witness whom Defendant intends to call as a witness. The United States also requests that the court make such orders as it deems necessary under Rule 16(d)(1) and (2) to insure that the United States receives the discovery to which it is entitled.

Federal Rule of Criminal Procedure 26.2 requires the production of prior statements of all witnesses, except Defendant. The time frame established by the rule requires the statement to be provided after the witness has testified, as in the Jencks Act. The United States hereby requests that Defendant be ordered to supply all prior statements of defense witnesses by a reasonable date before trial to be set by the court. This order should include any form these statements are memorialized in, including but not limited to, tape recordings, handwritten or typed notes and/or reports.

**IV**

**MOTION TO COMPEL FINGERPRINT EXEMPLARS**

As part of its case, the United States must prove that Defendant was previously deported from the United States. To prove this element, the United States anticipates calling a certified fingerprint examiner to testify that Defendant is the individual whose fingerprint appears on the warrants of deportation and other deportation documents. A number of chain of custody witnesses could be eliminated, and judicial resources conserved, by permitting the Government's expert to take Defendant's fingerprints himself. The Defendant's fingerprints are not testimonial evidence. See Schmerber v. California, 384 U.S. 757 (1966). Further, using identifying physical characteristics, such as fingerprints, does not violate Defendant's Fifth Amendment rights against self-incrimination. United States v. DePalma, 414 F.2d 394, 397 (9th Cir. 1969); Woods v. United States, 397 F.2d 156 (9th Cir. 1968); see also, United States v. St. Onge, 676 F. Supp. 1041, 1043 (D. Mont. 1987). Accordingly, the Government requests that the Court order that Defendant make himself available for fingerprinting by the Government's fingerprint expert.

**LEAVE TO FILE FURTHER MOTIONS**

The United States does not oppose Defendant's request for leave to file further motions, so long as such motions are based on discovery not yet received by Defendant.

**V**

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that Defendant's motions, except where not opposed, be denied and the United States' motion for reciprocal discovery be granted.

DATED: August 6, 2008

Respectfully Submitted,

KAREN P. HEWITT
United States Attorney

***/s/ Christina M. McCall***

CHRISTINA M. McCALL
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>PEDRO DE LA ROSA-SOTO,<br>Defendant. | Case No. 08CR2031-H<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED that:

I, CHRISTINA M. McCALL, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101.

I am not a party to the above-entitled action. I have caused service of RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO COMPEL DISCOVERY, DISMISS INDICTMENT AND SUPPRESS STATEMENTS on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert Henssler

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 6, 2008.

/s/ Christina M. McCall
CHRISTINA M. McCALL